J-S35043-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN RE: ADOPTION OF: K.L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.A.M., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 272 WDA 2017 |

Appeal from the Order Entered January 6, 2017
in the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 85 of 2016

BEFORE: LAZARUS, RANSOM, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: FILED OCTOBER 15, 2018

Appellant, K.A.M. ("Father"), files this appeal from the order dated January 5, 2017, and entered on January 6, 2017,[1] in the Westmoreland County Court of Common Pleas, granting the petition of the Westmoreland

_____

[1] The subject order was dated January 5, 2017. However, the clerk did not provide and docket notice pursuant to Pa.R.C.P. 236(b) until January 6, 2017. Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)." Pa.R.A.P. 108(b). Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." Frazier v. City of Philadelphia, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999).

[*] Former Justice specially assigned to the Superior Court.

County Children's Bureau (the "Agency") and involuntarily terminating Father's parental rights to his minor son, K.L.M. ("Child"), born in December of 2013, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[2, 3] After a careful review, we affirm the trial court's order.

The trial court summarized the relevant procedural and factual history as follows:

> This matter stems from an underlying dependency case at No. CP-65-DP-[]-2016 (the "dependency case"). The minor child, K.L.M., was born [in] December [of] 2013, with biological mother testing positive for marijuana. This initiated involvement with the [Agency]. A case was opened to initiate services for the biological mother and Father with regard to K.L.M. and his half-brother, who was also under the care of the biological mother and Father, and who had previously been the subject of several agency referrals. During the assessment phase, numerous concerns were brought to light, including inadequate housing and parenting, and mental health concerns for both parents, including Father's persistent issue with anger.
>
> K.L.M. was adjudicated dependent on June 19, 2014. This was based on an incident in which the biological mother was present in her apartment with the minor child, his half-sibling, and two men. Mother and one of the men became involved in a physical altercation in which K.L.M.'s crib was shoved and knocked over with the child inside. The same men also choked K.L.M.'s three-year-old half-brother. For approximately the first year after the child's adjudication, Father struggled to complete various services. He was initially ordered into anger management,

_____

[2] By separate order entered the same date, the trial court involuntarily terminated the parental rights of S.A.T. ("Mother") with respect to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother neither filed a separate appeal nor is a party to the instant appeal.

[3] Mother's older son and Child's half-brother, K.J.M., Jr., was also a subject of the termination proceedings in question. He is, however, not a subject of the instant appeal.

however he did not get along with the assigned counselor, and his anger issues appeared to worsen at this time. By May of 2015, Father was being escorted out of multiple visits because of his temper, and he was moved from merely supervised visitation to therapeutic visitation with the child.

Father's progress at this point, however, seemed to turn around. Father was heavily involved with therapist Alexis Jacomen of King and Associates over this time period, as she was his supervised visitation specialist beginning in July of 2015. Ms. Jacomen testified that Father made substantial progress in this time, and was compliant with her directives. Father seemed excited to parent K.L.M. while being compliant with all ordered services, including anger management through a different provider. Ms. Jacomen found Father consistently attentive and engaged with regard to the child; he appeared to be set on the path to reunification, and the Permanency Review Orders throughout this time period are reflective of the same.

Due to Father's progress, a trial home visit was scheduled with the child and the child's half-sibling, beginning on February 5, 2016. During the pendency of the trial home visit, Father began to display worrisome behaviors including asking the caseworker to bring him essential supplies such as food and diapers. During the visit, which lasted less than two weeks, Father also asked the foster mother to babysit the children as they had become overwhelming for him. According to testimony from Ms. Jacomen, it quickly became apparent that Father was unable to successfully parent the children on his own due to these and similar concerns, however the trial home visit was brought to an even quicker end because of criminal allegations against Father that surfaced at this time. It was alleged that Father had inappropriate sexual relations with a thirteen-year-old. Father was eventually determined to be an indicated perpetrator of this abuse. K.L.M. and his half-sibling were removed from Father's care on February 13, 2016, due to these allegations.

At this point, Father was moved back to supervised visitation with Ms. Jacomen. She describes Father's parenting from February through May as being on a severe downhill slide. She states that Father cancelled a number of the visits and when he did appear, he would be distant from the child, sometimes staying on his phone via Bluetooth for the duration of the visit. Ms. Jacomen would attempt to redirect Father to focus on the child, however he would continue to discuss his pending criminal case, often while becoming agitated and using inappropriate

language in front of the child. Ms. Jacomen testified that Father was behaving in a completely opposite manner compared to his parenting before the trial home visit, and that no amount of redirection was successful. Father's sudden shift in attitude toward K.L.M. was confusing and distressing to the child, even bringing him to the point of tears. The caseworker testified that Father's anger issues are presently back to the same level as when the case was initially opened for service.

Father's criminal involvement regarding the February 2016 allegations is detailed at Docket Number [ ]. Father is currently charged with statutory sexual assault with a victim over age eleven, involuntary deviate sexual intercourse with a person less than sixteen years of age, criminal solicitation of child pornography, child pornography, corruption of minors, contact or communication with a minor constituting sexual abuse, criminal use of a communication facility, and indecent assault of a person less than sixteen years of age. All charges have been waived for trial, and all charges, excepting the last, are felony charges. Father was incarcerated in the Westmoreland County Prison on May 27, 2016, where he presently remains, awaiting trial.[4]

Testimony was given by Corrections Counselor, Derek Enciso, who has worked with Father at the prison throughout his incarceration. Mr. Enciso works with Father during his time in disciplinary segregation, which he described as an inmate being removed from the general prison population as a punishment for disciplinary infractions. He described Father's behaviors as excessively violent and defiant, even when compared to other individuals in the prison population. Mr. Enciso described numerous instances of Father's disobedient and sometimes aberrant behaviors placing him in disciplinary segregation for weeks at a time, accounting for a large portion of Father's total time in prison up to the point of the January 5, 2017, hearing.

Father's first infraction occurred on June 9, 2016, not even two weeks into his incarceration. On this occasion, Father physically resisted movement, refused to obey the corrections officer, and created a disturbance by destroying security equipment, leading to twenty (20) days of disciplinary segregation. On July 19, 2016, Father received thirty (30) days of disciplinary segregation for creating a disturbance and

_____

[4] As reflected by the criminal docket, all charges were held for court on August 16, 2016. See Agency Exhibit 2.

- 4 -

disrupting normal operations by disobeying lawful written orders. On September 13, 2016, Father received disciplinary segregation for an incident which involved an assault with possession of a deadly weapon; specifically, Father placed sharpened pencils between his fingers in a closed fist and wrapped his hand with torn bed sheets to secure the pencils in a porcupine-like manner, before repeatedly punching another inmate. On November 14, 2016, Father resisted physical movement, disrespected corrections staff, and threatened them with bodily harm. Within the same incident, Father threw bodily fluids and human fecal matter at others. He received a total of sixty (60) days of disciplinary segregation for this incident, continuing through the time of the January 5, 2017, hearing.

Owing to the above disciplinary infractions, Father has been placed in disciplinary segregation for a large part of his time in the Westmoreland County Prison. When a prisoner is subject to disciplinary segregation, he or she is unable to have any parent-child visitation, and he or she is limited in participation in educational programs. Father's disciplinary segregation has prevented Father from participating in a parenting program in which he initially enrolled, and it has prevented him from any visitation with the minor child. Alexis Jacomen testified that, at least once per month since the beginning of Father's incarceration, she contacted the prison to set up visitation with Father and K.L.M., but each time she was informed that Father was in disciplinary segregation and was not able to visit with the child. For this reason, Father has had no contact with K.L.M. since May 20, 2016. Father has not even attempted to send K.L.M. any letters, cards, or gifts since that time.

K.L.M. is currently thriving in his foster home. The caseworker, Colleen Flynn, reported that because he was placed in foster care at five (5) months of age, K.L.M. never had any issues adjusting. She states that he is consistently happy and pleasant-tempered child, and that he is very attached to both his foster parents and his foster siblings. She stated that he does not speak about or inquire of Father. The Court Appointed Special Advocate noted that when the child was asked to bring in a family photo for school show-and-tell, the child proudly presented a

picture of his foster family, stating to the teacher "all of these people are in my family, and they all love me."[5]

Trial Court Opinion ("T.C.O."), 3/7/17, at 2-5 (footnotes added).

On August 5, 2016, the Agency filed petitions seeking to involuntarily terminate parental rights. The trial court conducted a hearing on the termination petitions on January 5, 2017. In support thereof, the Agency presented the testimony of the following: Derek Enciso,[6] corrections counselor, Westmoreland County Prison; Alexis Jacomen, therapist and supervised visitation specialist, King & Associates; Amber Gordon, permanency specialist, Project Star;[7] Colleen Flynn, Agency caseworker; and Mary Koziara, the Court Appointed Special Advocate ("CASA"). Father, who was represented by counsel, did not present any evidence on his behalf.[8]

_____

[5] Upon review of the Notes of Testimony, it appears that the CASA was actually referring to Child's half-brother, and not Child, with regard to this statement. Notes of Testimony ("N.T."), 1/5/17, at 121-22; see also Judicial Exhibit 1 at 3.

[6] Mr. Enciso is improperly identified as Derek Encisco in the Notes of Testimony.

[7] Ms. Gordon's testimony was relevant to Mother and the termination of Mother's parental rights.

[8] It is unclear whether Father was present, participated via telephone from prison, or neither, at the January 5, 2017, hearing. We observe that, while the trial court discusses the lack of Father's former counsel's filing a transport order, counsel appears to consult with Father during the proceeding. N.T., 1/5/17, at 4-5, 131.

Mother, present and also represented by counsel, testified on her own behalf. Child was represented by a guardian ad litem, Doreen N. Petonic, Esquire, during the proceedings.

Following the hearing, on January 6, 2017, the trial court entered an order involuntarily terminating the parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[9] On February 6, 2017, Father, through counsel, filed a notice of appeal, along with a concise statement of errors appointed complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[10, 11]

On appeal, Father raises the following issues for our review:

I.    Whether the trial court erred in finding by clear and convincing evidence that the [Agency] met its burden, under 23 [Pa.C.S.A. § 2511(b)], that the best interest of the Child is met by terminating Father's parental rights?

II.    Whether the trial court erred by not appointing counsel for the Child pursuant to 23 [Pa.C.S.A. § 2313(a)]?

Father's Brief at 4.

_____

[9] This order memorialized the decision placed by the court on the record at the conclusion of the hearing. N.T. at 147-50.

[10] While the notice of appeal should have generally been filed no later than February 4, 2017, February 4th fell on a Saturday. Hence, the notice of appeal was timely filed on Monday, February 6, 2017. See Pa.R.A.P. 903(a) (notice of appeal shall be filed within thirty days after the entry of the order from which the appeal is taken); 1 Pa.C.S.A. § 1908 (computation of time).

[11] Subsequent to the filing of a notice of appeal and concise statement of errors complained of on appeal, new counsel was appointed for Father.

Initially, we address Father's second issue with regard to the appointment of counsel for Child pursuant to 23 Pa.C.S.A. § 2313(a). Father argues that the instant matter should be remanded to the trial court to appoint counsel for Child and conduct a new termination proceeding. Father's Brief at 8. Both the Agency and guardian ad litem suggest waiver of this issue for Father's failure to raise it before the trial court and/or failure to raise it in his concise statement of errors complained of on appeal. Agency's Brief at 14-15; Guardian ad litem's Brief at 7-8. While we do not find waiver, we find that Father's claim lacks merit.

As to the appointment of counsel to represent a child in involuntary termination proceedings, 23 Pa.C.S.A. § 2313(a) provides:

§ 2313. Representation.

(a) Child.--The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

Our Supreme Court, in In re Adoption of L.B.M., 639 Pa. 428, 441-42, 161 A.3d 172, 180 (2017) (plurality), held that Section 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interests as synonymous with his or her preferred outcome and distinct

from a child's best interests, which must be determined by a court. Id. at 432, 161 A.3d at 174-75. In In re Adoption of L.B.M., four justices agreed that a guardian ad litem who is an attorney may act as counsel pursuant to Section 2313(a) so long as the dual roles do not create a conflict between the child's best interest and legal interest. Id. at 447-62, 161 A.3d at 183-93.

Recently, in In re T.S., ___ A.3d___, 2018 WL 4001825 (Pa. filed Aug. 22, 2018), our Supreme Court re-affirmed this legal principle, and, in so doing, acknowledged that this Court had on multiple occasions recognized the majority view expressed in In re Adoption of L.B.M. See In re T.S., supra at *6 (citing D.L.B., 166 A.3d 322 (Pa.Super. 2017) and In re Adoption of T.M.L.M., 184 A.3d 585, 588 (Pa.Super. 2018)). Critically, in In re T.S., in finding that the trial court did not err in allowing the children's guardian ad litem to act as their sole representative during the termination proceeding, the Supreme Court noted that, at two and three years old, the children were incapable of expressing their preferred outcome of the termination proceeding. In re T.S., supra. Thus, the Supreme Court held that a conflict did not exist since the children in question were very young and pre-verbal such that their preferences were not discernable. Id.

The Supreme Court reasoned, "As a matter of sound logic, there can be no conflict between an attorney's duty to advance a subjective preference on the child's part which is incapable of ascertainment, and an attorney's

concurrent obligation to advocate for the child's best interests as she understands them to be." Id. As such, the Court held:

> [I]f the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S.[A.] § 2313(a), is satisfied where the court has appointed an attorney-guardian ad litem who represents the child's best interests during such proceedings.

Id. at *10.

Moreover, the Supreme Court in In re T.S. held that a child's right to counsel was not subject to waiver. Id. at *5.

> The statutory right under Section 2313(a) belongs to the child, not the parent. Accord In re E.F.H., 751 A.2d 1186, 1189 (Pa.Super. 2000). There was no attorney representing solely the children's legal interests who could have raised their rights in the trial court, and the children plainly could not have done so themselves. See In re K.J.H., 180 A.3d 411, 413 (Pa.Super. 2018) ("Child, due to his minority and lack of representation in the orphans' court, could not raise this issue himself."); c.f. Pa.R.J.C.P. 1152(A)(2) (stating minors can waive counsel in dependency cases only if the waiver is knowing, intelligent, and voluntary, and the court conducts a record colloquy). We conclude, then, that the failure of any party, . . ., to affirmatively request separate counsel for the children cannot have constituted waiver.

In re T.S., supra at *5.

In the case sub judice, Child was represented in the termination proceeding by the guardian ad litem, who is an attorney that also represented Child throughout the dependency proceedings. Notably, Child turned three only one month prior to the termination hearing. Child had just begun to

- 10 -

verbalize words like "apple, bite, dad, and cupcake" in April 2016, only a little over six months prior. N.T. at 31, 114. Moreover, Colleen Flynn, an Agency caseworker, noted that, at the time of trial, "[Child] just turned three. He's very hard to interview." Id. at 104-05. As such, it is clear that Child was too young and unable to express his preferred outcome in this case. Thus, the court's appointment of a guardian ad litem satisfied Child's right to appointed counsel pursuant to 23 Pa.C.S.A. § 2313(a). [12] In re T.S., supra at *10.

Next, we turn to Father's first issue and the termination of his parental rights.

In matters involving the involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

_____

[12] We note Attorney Petonic participated in the cross-examination of witnesses throughout the termination hearing and argued and submitted a brief in support of the termination of Father's parental rights. See N.T. at 136-38; Guardian ad litem's Brief.

In re T.S.M., 620 Pa. 602, 628, 71 A.3d 251, 267 (2013).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G. & J.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result."  In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights.  Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.  One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).  We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  In re

C.S., 761 A.2d 1197, 1201 (Pa.Super. 2000) (en banc) (quoting Matter of Adoption of Charles E.D.M. II, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case sub judice, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). In re B.L.W., 843 A.2d 380, 384 (Pa.Super. 2004) (en banc). Here, Father does not challenge the trial court's finding of grounds for termination under Section 2511(a). We, therefore, analyze the court's termination pursuant to Section 2511(b) only, which provides as follows:

> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

With regard to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d

781, 791 (Pa.Super. 2012). In In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.], [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

In re T.S.M., 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." In re K.Z.S., 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case sub judice, in reasoning that termination of Father's parental rights favors Child's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated:

> In consideration of 23 Pa.C.S.[A.] § 2511(b), it is clear that the developmental, physical and emotional needs and welfare of K.L.M. are such that Father's parental rights should be terminated. K.L.M. is currently thriving in his foster care placement, where he resides with his half-brother. He refers to his foster parents as "mom" and "dad," and his foster siblings as his brothers and sisters. As he has been in placement since he was five months old, his foster parents are the only parents he has ever known, and he appears consistently happy and loved.
>
> A consideration of the emotional bond between the minor child and the child's biological parent is necessary in any case involving involuntary termination of parental rights. K.L.M. does not appear to exhibit any sort of bond or emotional connection with Father. He makes no mention of Father even though he has not seen him for over nine months. Father has not reached out to the child in any way in this time frame. K.L.M. seems completely happy and adjusted in his foster family. All of the child's emotional, developmental, and physical needs have been met by his foster parents since five (5) months of age. Allowing the termination of parental rights to proceed would best serve the emotional needs of the child, as it would provide a complete sense of permanency for the child with regard to the strong emotional bonds he has established with the foster parents. Additionally, it would have no adverse effect on the child, as there appears to be absolutely no emotional bond between K.L.M. and Father.

T.C.O. at 10-11 (citations omitted).

Father, however, argues that the Agency failed to meet its burden of proof. Father's Brief at 8. Specifically, Father contends that a bonding

assessment was not conducted. Id. at 7. He states, "While a bonding assessment is not required, the record should not be devoid of substantive testimony regarding whether a bond exists between Father and Child. This is especially true in a case where the Father had a trial home visit with the child []6[] months prior to the filing of the termination petition." Id. at 8. We disagree.

Upon review, the record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of Child's needs and welfare, and as to the existence of a bond between Father and Child that, if severed, would not have a detrimental impact on him.

At the time of the hearing, Child had been removed from parental care and in placement for approximately two and one-half years. N.T. at 79-80. From March through May of 2016, subsequent to Father's failed trial home visit, only five of twelve scheduled visits took place, with Father cancelling six of the seven missed visits. Id. at 21-22, 49. Further, Father's visitation specialist, Alexis Jacomen, described these visits as devolving into an "absolute downward spiral." Id. at 23. Father no longer focused on or engaged Child. Id. at 23, 39, 48. He was distracted and disinterested and

often on the phone or talking with other people. He discussed inappropriate topics and used inappropriate language.[13] Id. at 23-33, 94.

In addition, Father failed to care for, comfort, and console Child, id. at 29-31, 48, and failed to recognize developmental advancements. Id. at 31. Ms. Jacomen observed a "lack of engagement and just the lack of acknowledgement" of Child. Id. at 39. Father was "unable to focus on anything at all during the visits outside of himself." Id. Ms. Jacomen confirmed that the relationship between Father and Child, therefore, "digressed" and proceeded "downhill," stating, "[Father] used to pick [Child] up and hold him and he was very loving. And that changed. It completely changed." Id. at 39-40. She further revealed that Child, who was only still two years old, began to cry at visits. When asked why, Ms. Jacomen explained:

> My opinion would be that when Dad is ignoring him and he has to be held and he's not being held, he, at that time, was, you know a two-year-old child who just wanted to be held and comforted. It wasn't happening. And he has no way of understanding that. He just knows he doesn't like it.

Id. at 39-40. Thereafter, Father had no contact with and had not seen Child since his incarceration on May 27, 2016, due to disciplinary infractions

_____

[13] Ms. Jacomen testified to numerous attempts at redirection. Id. at 27-28, 51-52.

incurred in prison, which prevented visitation.[14, 15]  Id. at 34-35, 37, 90-91, 95, 119-20.  As a result, Agency caseworker, Colleen Flynn, testified that Child has not seen Father for an extended period of time and essentially no longer knows Father.  Id. at 99, 103-05.  Ms. Flynn, therefore, further opined that there would be no detriment to Child in terminating Father's parental rights.  Id. at 99, 103.

Notably, Ms. Flynn admitted that Father's behavior during his last visits with Child suggest issues with parenting, and his disciplinary actions in prison exhibit that he "still has the same anger problems today the he had in the beginning." Id. at 96.  Further, the fact that Father is an indicated perpetrator of sexual abuse presents "a safety hazard."  Id. at 97.

Moreover, Child is "happy" and "very well-adjusted" in his foster home where he had been placed with his half-brother for almost two years at the time of the hearing.  Id. at 86, 99, 103-04.  As noted by Ms. Flynn, "[H]e's happy.  He feels -- they treat him like he's their own."  Id. at 99.  She continued, "He's always very happy.  He's very attached to not only the foster parents, but the other kids in the home."  Id. at 103.  "[I]t's like he's a member of that family."  Id. at 105.  To this point, Ms. Flynn indicated that

---

[14] Father last saw Child on May 20, 2016.  Id. at 119-20.

[15] Ms. Jacomen indicated that she contacted the prison "almost monthly" with regard to Father's availability for visitation.  Id. at 34.

Child refers to his foster parents as "mom" and "dad." Id. at 104. Similarly, the CASA report reflects a positive, affectionate relationship between Child and his foster family. See Judicial Exhibit 1 at 2-3. Thus, as confirmed by the record, termination of Father's parental rights serves Child's developmental, physical and emotional needs and welfare.

Based on the foregoing analysis of the trial court's termination of Father's parental rights, we, therefore, affirm the order of the trial court.[16]

Order affirmed.

Judge Ransom did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/15/2018

_____

[16] On November 13, 2017, the Westmoreland County Children's Bureau filed an Application for Relief seeking to expedite this matter. In response, this Court informally notified the parties that the matter was required to be held internally pending the outcome of In re: K.R., 692 & 693 WDA 2017, J-E03007.17. Subsequently, as indicated in this Court's per curiam order filed on September 24, 2018, during the pendency of In re: K.R., our Supreme Court filed a precedential opinion in In re: T.S., ___ A.3d ___, 2018 WL 4001825 (Pa. filed Aug. 22, 2018), to which this Court is bound. Thus, we now formally deny as moot the November 13, 2017, Application for Relief.